**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Newport News Division**

| | |
|---|---|
| _____ ) | |
| **H.C., an infant and minor by and through his** ) | |
| **Parents and Next Friends C.C and M.C.,** ) | |
| **C.C., individually, and** ) | |
| **M.C., individually,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. _____** |
| ) | **TRIAL BY JURY DEMANDED** |
| **MATHEWS COUNTY SCHOOL BOARD,** ) | |
| **NANCY WELCH,** ) | |
| **LAUREL BYRD,** ) | |
| **APRIL EDWARDS,** ) | |
| **DENISE MCCUISTON, and** ) | |
| **GABRIELLE "GABBY" CROWDER,** ) | |
| ) | |
| **Defendants.** ) | |
| _____) | |

## COMPLAINT

### INTRODUCTION

This action arises from an abuse of authority relating to, and the unconstitutional and tortious application of, the Commonwealth of Virginia's threat assessment process, pursuant to Virginia Code § 22.1-79.4. For a period of nearly four months, Defendants in bad faith, without reasonable cause, and maliciously pursued a biased and covert investigation against a minor student, Plaintiff H.C., under the guise of the threat assessment process. At the end of the process, they falsely concluded that H.C. was an "imminent threat," and, in so many words, a criminal, racist, and sexual deviant. Defendants then placed their false and stigmatizing conclusions in H.C.'s permanent student record and removed him from his school and peers indefinitely.

The entire process above occurred unbeknownst to and without the involvement of

1

Plaintiffs, H.C. and his parents C.C. and M.C.  Indeed, Defendants did not inform Plaintiffs of their investigation, exchange information with Plaintiffs, or seek Plaintiffs' input or evidence. Defendants provided Plaintiffs no meaningful or effective notice and opportunity to be heard and no avenue to challenge the above conclusions, either through an impartial name-clearing hearing or an appeal.  And when Plaintiffs attempted to challenge the process, Defendants became more entrenched in their sham pursuit and maliciously instituted a criminal prosecution against H.C. Rightfully, a Virginia court dismissed the prosecution with prejudice, terminating it in H.C.'s favor.  This ordeal has been nothing short of a nightmare for Plaintiffs.

In this context, Defendants have violated Plaintiffs' constitutional rights and numerous state laws designed to protect them from such an abuse of authority.  For these violations, Plaintiffs allege the following claims: (1) Count I – violations of procedural and substantive due process rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution; (2) Count II –conspiracy to interfere with or violate these rights; (3) Count III – defamation; (4) Count IV – malicious prosecution; (5) Count V – abuse of process; (6) Count VI – intentional infliction of emotional distress; and (7) Count VII – gross negligence.

As a result of Defendants' actions, Plaintiffs have suffered tremendously and sustained significant economic, emotional, financial, personal, and reputational harm.  H.C. has been demonized and deprived of his right to an education.  Thus, Plaintiffs request relief here.

## PARTIES

1. Plaintiff H.C. is an individual and an infant and minor.  At all times relevant, he resided in Mathews County, Virginia.

2. Plaintiff C.C. ("Mr. C.") is an individual and the father and next friend of H.C.  At all times relevant, he resided in Mathews County.

3.      Plaintiff M.C. ("Mrs. C.") is an individual and the mother and next friend of H.C. At all times relevant, she resided in Mathews County.

4.      Defendant Mathews County School Board ("MCSB") is vested with the authority to oversee the Mathews County Public Schools ("MCPS") and its employees.

5.      Defendant Nancy Welch ("Welch") was at all times the superintendent and an employee of MCPS and acting under the color of State law.  Plaintiffs file this action against Welch in her individual and official capacities.

6.      Defendant Laurel Byrd ("Byrd") was at all times the principal and an employee of Thomas Hunter Middle School ("THMS"), which is in the MCPS, and acting under the color of State law.  Plaintiffs file this action against Byrd in her individual and official capacities.

7.      Defendant April Edwards ("Edwards") was at all times an investigator and an employee of the Mathews County Sheriff's Office and acting under the color of State law. Plaintiffs file this action against Edwards in her individual capacity.

8.      Defendant Denise McCuiston ("McCuiston") was at all times a school counselor and an employee of THMS and acting under the color of State law.  Plaintiffs file this action against McCuiston in her individual capacity.

9.      Defendant Gabrielle "Gabby" Crowder ("Crowder") was at all times an employee of THMS and acting under the color of State law.  Crowder is also the mother of a minor child, C.B.  Plaintiffs file this action against Crowder in her individual capacity.

## JURISDICTION AND VENUE

10.      This Court possesses original jurisdiction over Plaintiffs' claims in Counts I through II below, pursuant to 28 U.S.C. §§ 1331 and 1343, because these claims arise under the Constitution and laws of the United States.

3

11.     This Court possesses supplemental jurisdiction over the claims in Counts III through VII, pursuant to 28 U.S.C. § 1367, because these claims are so related to the federal claims alleged above in paragraph 11 that they form part of the same case and controversy.

12.     This Court, namely the Newport News Division of the Eastern District of Virginia, is the proper venue for Plaintiffs' Complaint, pursuant to 28 U.S.C. § 1391, because, upon information and belief, Defendants reside or are employed in this Division.  Moreover, their unconstitutional and tortious actions and omissions below occurred within this Division.

## FACTS

### a.     Plaintiffs Prior to H.C.'s 2019 Enrollment in the MCPS

13.     Mr. and Mrs. C. lived in Mathews County from 2002 to 2019.  They have two minor sons, including H.C.

14.     H.C. is 15 years of age.  Prior to the events giving rise to this Complaint, he had resided in Mathews County his entire life.

15.     H.C. is a well-rounded adolescent.  Academically, he performs well.  Socially, H.C. has friends, is enthusiastic, kind, soft-spoken, and well-liked, and, prior to the events giving rise to this Complaint, had regularly participated in his community and church.  Athletically, he excels. H.C. has been a member of a competitive sailing team, played intramural basketball and lacrosse, and ran cross-country in middle school.  H.C. has run several half marathons in under two hours and has developed an interest in running competitively on a high school cross-country team.

16.     Prior to the events giving rise to this Complaint, H.C. was motivated about his future.  He aimed to complete high school, attend the United States Naval Academy, and serve as a commissioned officer.

17.     From 2015 to 2019, H.C. was a student at Ware Academy.  At this private school,

4

he completed fourth through seventh grades.  He also completed advanced curricular requirements, qualifying him for the ninth grade in the 2019-2020 academic year.

18.     At all times during H.C.'s attendance at Ware Academy, Thomas Thomas was its Headmaster.  Headmaster Thomas handled all student disciplinary matters.

19.     H.C. had no disciplinary record at Ware Academy.  Prior to the events giving rise to this Complaint, he had no disciplinary record at any other school.

20.     H.C. had also never been charged with and convicted of a crime.

21.     After H.C. completed seventh grade at Ware Academy, his parents enrolled him in the MCPS and applied for his acceleration to the ninth grade at Mathews High School ("MHS").

22.     H.C. wanted to attend the high school to join its highly-regarded cross-country team and be with his older brother, who was a student there.

23.     In the summer of 2019, H.C. participated in daily training with the high school cross-country team in preparation for the upcoming season.  He was developing his competitive running skills and building bonds and friendships with his future teammates.

24.     At the time, Defendant Welch was the superintendent of the MCPS.

25.     Defendants Byrd, McCuiston, and Crowder were also THMS employees.

26.     Defendant Edwards was an investigator with the Mathews County Sheriff's Office.

27.     Through their employment, Defendants Welch, Byrd, McCuiston, Edwards, and Crowder had been colleagues for years.  Upon information and belief, they knew each other personally and discussed their lives and families.  THMS was a small and closely-knit community.

28.     Mathews County was also a small and closely-knit community.

29     Defendants Welch, Byrd, McCuiston, Edwards, and the Crowders knew Plaintiffs.

30.     In fact, Defendant Crowder and Plaintiffs had been next door neighbors between

2016 and 2019.  As such, their children had socialized in the same circle of neighborhood children.

31.     Defendant Crowder's minor son, C.B., however, bullied H.C.  C.B. had a reputation in the neighborhood for being a bully, causing trouble, physically attacking another child with a large stick and causing serious bodily injury, and having run-ins with the juvenile justice system.

32.     In the summer of 2016, two incidents occurred involving Plaintiffs and Defendant Crowder's family.  At the time, H.C. was 10 years old.  These incidents created an animosity and bias against Plaintiffs and, ultimately, set in motion the events leading to Defendants' acts and omissions against them, including the use of the threat assessment process.

33.     The first incident occurred in the summer of 2016 during an outdoor sleepover. H.C. and C.B. shared a tent.  C.B. attempted to assault H.C. in the tent.

34.     Defendant Crowder was married to Ryan Crowder, who was C.B.'s stepfather and a police officer.

35.     In the second incident, Mr. C. observed an inappropriate interaction between Mr. Crowder and H.C.  Mr. C. had been looking for H.C. one day, went into the Crowders's backyard, and found him and Mr. Crowder alone in the Crowders's pool.  Mr. C. observed that which appeared to be Mr. Crowder cornering H.C. and touching him inappropriately.  Mr. C. spoke with Mr. Crowder and told him to keep away from H.C.

36.     Upon information and belief, this conversation deeply embarrassed Mr. Crowder.

37.     C.B.'s bullying of H.C. increased after this incident.

38.     In May of 2017, H.C. was playing with another child on Plaintiffs' property. Uninvited, C.B. ran over with a large stick and attempted to attack H.C.

39.     During this incident, H.C. learned from the other child that C.B. had been spreading a false rumor.  C.B. had been saying that H.C. attempted to assault him during the sleepover above.

6

40.    H.C., who was 11 years old at the time, was upset by this statement, and he confronted C.B. about it.  H.C. went into his house, and C.B. went home.  Nobody was injured.

41.     Upon information and belief, C.B. then falsely reported to his parents that H.C. had threatened to kill him with a knife during the argument and attempted to assault him during the sleepover.  Both reports were false.

42.    Upon information and belief, Mr. Crowder was still ashamed by the conversation by the pool in 2016.  In short, the Crowders harbored personal ill-will, animosity, and spite toward Plaintiffs.

43.    Accordingly, on May 25, 2017, Defendant Crowder and C.B. met with a Mathews County Sheriff's Officer.  The meeting occurred at THMS.

44.    Upon information and belief, Defendants Welch, Byrd, McCuiston, and/or Edwards were aware of or had spoken with Defendant Crowder about the substance of this meeting.  At the meeting, Defendant Crowder falsely reported that H.C. had bullied and attempted to assault C.B. in 2016 and also threatened C.B. in 2017.

45.    Defendants supported Defendant Crowder as their colleague and friend.

46.    In fact, Defendant Edwards decided to begin an investigation of H.C., despite the officer above resolving it.  During her investigation, she accepted as true and without scrutiny Defendant Crowder's false reports.

47.    Between May of 2017 and July 14, 2017, Defendants Edwards and Crowder came up with a plan to punish H.C.  They agreed that Defendant Edwards was to file a report against H.C. with the Commonwealth of Virginia Department of Juvenile Justice ("DJJ").  Such a report lacked basis.

48.    In fact, Defendant Edwards had performed an insufficient investigation in arriving

at this plan with Defendant Crowder.  She disregarded exculpatory information concerning H.C.

49.     Upon information and belief, Defendant Crowder informed other Defendants of the plan.

50.     On July 10, 2017, Plaintiffs contacted the Crowders and, as they had done so for the past year, complained again that C.B. was bullying H.C. (e.g., taunting him with a police billy club and hatchet).  They requested keep C.B. keep off their property and away from H.C.

51.     Within days, on July 14, 2017, Defendant Edwards filed the report against H.C.

52.     DJJ Intake Officer Kathleen Kellar promptly disposed of the report.  Following an interview with Plaintiffs, Kellar concluded that the report was not validated and that it warranted no further action.  She noted that Plaintiffs had "handled situation appropriately" and H.C. was "only 11 years old."  She further commented that the report was "ridiculous" and "inconsistent" and tore it up in front of Plaintiffs.  Kellar closed her file and the report as "Resolved at Intake."

53.     Upon information and belief, Defendants Welch, Byrd, McCuiston, Edwards, and Crowder became aware of, disagreed with, and were frustrated by Kellar's handling of the report. Through their conversations with Defendant Crowder over the years, Defendants Welch, Byrd, McCuiston, and Edwards had become biased against H.C.  They did so and formed opinions against H.C. without ever having really met or spoken with him.

54.     After Plaintiffs' meeting with Kellar, H.C. and C.B. had no further contact.

**b.     Plaintiffs after Enrollment at the MCPS and the Threat Assessment Process**

55.     In May of 2019, the individual Defendants learned that H.C. had enrolled in the MCPS.  Upon information and belief, Defendant Crowder conveyed her opposition to the enrollment. C.B., at the time, was a middle school student at THMS.

56.     Yet, H.C. had applied for enrollment at the high school.

57.     Consequently, Defendants agreed and came to a meeting of the minds to support Defendant Crowder, oppose H.C.'s enrollment, and target him for punishment.

58.     Defendants saw their opportunity to do so through the threat assessment process.

59.     Virginia Code § 22.1-79.4 creates a threat assessment process, which provides:

A.      Each local school board shall adopt policies for the establishment of threat assessment teams, including the assessment of and intervention with students whose behavior may pose a threat to the safety of school staff or students . . . .

        *       *       *       *       *       *       *       *       *       *       *

C.      Each division superintendent shall establish, for each school, a threat assessment team that shall include persons with expertise in counseling, instruction, school administration, and law enforcement . . . .  Each team shall (i) provide guidance to students, faculty, and staff regarding recognition of threatening or aberrant behavior that may represent a threat to the community, school, or self; (ii) identify members of the school community to whom threatening behavior should be reported; and (iii) implement policies adopted by the local school board pursuant to subsection A.

D.      Upon a preliminary determination that a student poses a threat of violence or physical harm to self or others, a threat assessment team shall immediately report its determination to the division superintendent or his designee.  The division superintendent or his designee shall immediately attempt to notify the student's parent or legal guardian.  Nothing in this subsection shall preclude school division personnel from acting immediately to address an imminent threat.

60.     The Commonwealth of Virginia Department of Criminal Justice Services's define an "imminent threat" to exist "when the person/situation appears to pose a clear and immediate threat of serious violence toward others that requires containment and action to protect identified or identifiable target(s); and may also exhibit other concerning behavior that require intervention."

61.     Pursuant to Virginia Code § 22.1-79.4, Defendant MCSB created a local threat assessment policy (Policy EBB, "Threat Assessment Teams").  (*See* attached Exhibit 1.)  Policy EBB is one page in length and parrots Virginia Code § 22.1-79.4.  Policy EBB contains no specific procedure to provide parents and students notice and opportunity to be heard during the threat

assessment process or, at the conclusion of the process, to have a hearing and appeal.

62.     Policy EBB cross references other MCSB policies relating to, *inter alia*, "Student Conduct" and "Student Suspension/Expulsion."  Policy EBB is disciplinary or quasi-disciplinary in nature.

63.     What is more, because Policy EBB's deficiencies and application require parents and students to accept the threat assessment team's conclusions without dissent or recourse, the opportunity for an abuse of authority and harm is staggering.

64.     Already biased against H.C., Defendants Welch, Byrd, McCuiston, and Edwards combined to form a threat assessment team to target H.C. with the objectives of opposing his enrollment and to punish him where they believed Kellar had been derelict.  Thereafter, these Defendants, in concert with Defendant Crowder, tasked themselves to find any reason, no matter how dated, false, flimsy, one-sided, and unreliable to accomplish these objectives.

65.     On or about May 14, 2019, Defendant McCuiston notified the MCSB that Defendants had commenced the threat assessment process against H.C.

66.     On or about June 4, 2019, Defendants Edwards and McCuiston met, discussed their objectives and strategy, and, again, shared their mutual dissatisfaction with Kellar's handling of the report in 2017.

67.     At or around the same time, one or more Defendants, including Defendants Byrd and Edwards communicated with the Mathews County Commonwealth Attorney to discuss the report.  The Commonwealth Attorney responded that there was nothing further he could do.

     c.     **The Demonizing Conclusions from the Threat Assessment Process**

68.     Between May 14, 2019 and August 27, 2019, Defendants in bad faith, maliciously, and without reasonable cause acted to accomplish their biased objectives.  In the course of the

threat assessment process, they accepted without scrutiny the truth of Defendant Crowder's false reports of incidents between H.C. and C.B.  In fact, they did not even meet with or speak to H.C. (or, upon information and belief, C.B.).  They did so knowing Kellar had already disposed of the very matters they were pursuing.

69.     In the course of the threat assessment process, Defendants concluded as follows:

(a)     Headmaster Thomas had told Defendant McCuiston, according to her report, that (i) H.C. was "frequently put out of school for behaviors including racial comments, lining up black children to berate them, called a student [the 'n' word] and that [H.C.] shoved a black child against the locker or wall giving that student a concussion"; and (ii)  that H.C. was subject to "disciplinary action" for the above "racially-motivated incident";

(b)     Headmaster Thomas told Defendant McCuiston, according to her, that H.C. was involved in a "Spring 2019 alleged incident at Ware Academy involving sexual misconduct"; and

(c)     H.C. in "Spring 2019" had "access to a gun" and "had been shooting it in [his] yard."

70.     Headmaster Thomas never reported the incidents Defendant McCuiston cited, despite her report he had.  The incidents were manufactured, lacking in context, and false.

71.     Additionally, H.C. did nothing illegal with any gun.  Defendants did not care and were undeterred.

72.     Again, no procedure exists under Policy EBB for anybody to scrutinize Defendants objectively; Defendants were unconstrained and free to do as they pleased.

73.     On August 27, 2019, Defendants Welch, Byrd, McCuiston, and Edwards met to discuss and finalize their conclusions.  Despite investigating the matter for four months, Defendants agreed and concluded that H.C. was an "imminent threat," to C.B.  Again, H.C. had

no contact with C.B. since 2017 and had applied to the high school.

74.     Removing H.C. from the MCPS to homebound instruction, Defendants concluded:

(a)     "[H.C.] will not be allowed on school grounds (to include . . . THMS, and MHS)";

(b)     "[H.C.] will not be allowed at any school-sponsored event – regardless of location;

(c)     "[H.C.] will complete an interview with [a] school psychologist and School Counselor, Ms. McCuiston";

(d)     "[H.C.] must attend intensive-counseling by a licensed professional counselor to address threats to others, sexual aggression and racially based hate crimes";

(e)     "[H.C.] must have a psychological and behavioral evaluation . . . . ;

(f)     "A homebound teacher will be assigned to deliver educational services to [H.C.] at a neutral location for core subjects"; and

(g)     "The threat assessment team will meet again in 2 months to review progress and will re-assess risk; at which point they will review evaluations, counseling reports and another [sic] pertinent information."

75.     In conjunction with the conclusions above, the homebound instruction to which Defendants compelled H.C. was materially inadequate and inferior.  For example, a single MCPS teacher cannot provide H.C. the depth, duration, intensity, and quality of teaching to meet his core education, and the MCPS lacked the resources to do so.  Moreover, upon information and belief, the MCPS had compelled other students to homebound instruction and, as a result, those students regressed in their education.  H.C. will also be alone, unable to hear and exchange ideas and perspectives with his peers on core matters, deprived of the group education experience, and ostracized from the social structure inherent in a classroom environment.  Compounding the deficiencies, Defendants also banned H.C. from all MCPS property, prohibited him from all

MCPS-related activities and extracurricular activities, irrespective of location, and, despite his need to develop his athletic skills, foreclosed his ability to join the high school cross-country team.

76.     On August 28, 2019, Defendant Byrd met with Mr. and Mrs. C. and conveyed on behalf of Defendants the above conclusions and their finality.

77.     Mr. and Mrs. C., who had never heard of the threat assessment process, were in shock.  Defendants had demonized and stigmatized their son based on dated, flimsy, and unreliable information, manufactured incidents, and Defendant Crowder's false reports.  Not once had Defendants requested and obtained their input.

78.     During this meeting, Defendant Byrd engaged in no exchange of information.  She offered no hearing, name-clearing or otherwise.  Defendant Byrd even stated, "as the principal of a school, it is not my burden to prove that a child did something or did not do something."

79.     Perhaps to cause Mr. and Mrs. C. to leave her office, Defendant Byrd falsely stated to Plaintiffs no less than four times that they had a right to appeal to Defendant Welch (who, coincidentally, was also a member of the threat assessment team).

80.     Mr. and Mrs. C., realizing their pleas to be heard were being ignored, left.

81.     Later that day, Defendant Byrd, in concert with Defendants Welch and Edwards, filed a meritless child abuse and neglect report against them with the local Department of Social Services.  In the claim, she falsely stated that H.C. had been "kicked out of [Ware Academy] because of sexual situations."  She also falsely stated that H.C., through his parents, had refused to comply with Kellar's counseling and diversion requirements.  As alleged above, Kellar had imposed no such requirements and had disposed of the matter at intake.

82.     The Department of Social Services promptly screened out Defendant Byrd's report and found it did "Not Meet Abuse/Neglect Definition."

83.     On September 11, 2019, and before Plaintiffs attempted to exercise their purported right to an appeal, Defendant Welch contacted them and reiterated her team's conclusions.  She threatened, "[f]ailure to comply will result in notification of local law enforcement."  Defendant Welch continued, "prior to re-enrollment in [MCPS], evidence of compliance with 'steps taken to contain the threat . . . shall be necessary."  According to her, "[H.C.] must attend intensive counseling by a licensed professional counselor to address threats to others, sexual aggression and racially based hate crimes" and "[H.C.] must have a psychological and behavioral evaluation." Defendant Welch concluded, H.C.'s "pattern of behaviors are [sic] extremely concerning."

84.     Defendant Welch then placed the above communication (and her team's conclusions) in H.C.'s student record.  She also copied Defendant Byrd and the Department of Social Services.  Defendant Welch did so knowing that the MCPS discloses without consent any student record to any school or post-secondary institution to which the student may enroll.

85.     On September 27, 2019 and October 3, 2019, Plaintiffs attempted to appeal to the MCSB.  Mr. C. pleaded, "[m]y family is wanting to be heard regarding the 'Threat Assessment' as we did not have any opportunity to discuss or submit matters regarding this investigation and what pertains."  Rather than hear an appeal, the MCSB forwarded the request to Defendant Welch.

86.     On October 4, 2019, Defendant Welch responded, "[p]er your request for an 'appeal' to [sic] the threat assessment: the process of a threat assessment is not disciplinary in nature, there is no means of appeal to the [MCSB]."

87.     Between October 4, 2019 and November 13, 2019, and upon information and belief, Defendants became concerned with Plaintiffs' repeated requests to be heard on the matter and, thus, began to fear the possibility of civil liability.

88.     Therefore, on November 13, 2019, Defendants, by and in concert with Defendant

14

Edwards, instituted criminal proceedings against H.C.  Defendant Edwards filed two criminal petitions, charging H.C. with felonious attempted assault of C.B. for the matters Kellar had closed.

89.     Upon information and belief, Defendants did so in anger, reprisal, to silence the Plaintiffs, and in an effort to force a plea deal from H.C. to protect themselves from civil liability.

90.     At or around the time Defendants instituted this prosecution, Defendant Crowder bragged to a witness, "we fixed things pretty good for [H.C.] so he can never return to Mathews County Public School again."  She then disclosed to the witness conclusions of the threat assessment team's, to which she should have never been privy.

91.     On May 11, 2020, the Juvenile & Domestic Relations Court of Mathews County dismissed the petitions against H.C. with prejudice.  The Court also noted that, "[t]his case was originally handled by Intake in 2017 . . . when [H.C.] was less than 14 years of age."  In short, Defendants' criminal petitions lacked probable cause and should have never been filed.

92.     After dismissing the petitions, the Court denied Defendant Edwards's attempt to compel a DNA swab of H.C.

93.     Due to the above events, Plaintiffs had no choice but to relocate from Mathews County, start a new life elsewhere, and leave the only place H.C. and his brother had called home.

        **d.     The Ruinous Aftermath from the Threat Assessment Process**

94.     As a result of the threat assessment process, Plaintiffs have suffered tremendously and sustained significant economic, emotional, financial, personal, and reputational harm.

95.     H.C. has suffered and continues to suffer extreme anxiety, bouts of depression, despair, disruption, fear, insomnia, isolation, ostracism, nightmares, pain, stress, and uncertainty. He has required psychotherapy.  H.C. has been demonized, stigmatized, and branded a criminal, racist, sexual deviant in need of psychological intervention and, in so many words, quarantine.

Defendants have ruined his reputation and future.

96.     Mr. and Mrs. C. have suffered in the same way.  What is more, as parents, they have suffered and continued to suffer their child's suffering.  Plaintiffs have had to relocate their family, out of fear and due to the damage caused to their reputations.  Professionally, the relocation has harmed and resulted in losses to their businesses and professions, causing financial injuries.

97.     On August 4, 2020, H.C.'s psychotherapist opined as to his clinical impressions of H.C.  He opined, H.C. "is a likeable, polite, respectful, soft-spoken, non-judgmental and forgiving young man who is not in any tangible way an 'imminent threat' to anyone" and, as Defendants had been aware, "[t]here is certainly no valid evidence that he would pose any threat to others if he were to attend public school."

### COUNT I
### Violation of Procedural and Substantive Due Process Rights
### Fourteenth Amendment to the United States Constitution
### (All Plaintiffs v. All Defendants)

98.     Plaintiffs incorporate and re-assert fully herein the allegations of paragraphs 1 through 97, *supra*.

99.     The Fourteenth Amendment to the United States Constitution mandates that no State shall "deprive any person of life, liberty, or property, without due process of law."

100.    Furthermore, 42 U.S.C. § 1983 provides:

Every person who, under the color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

101.    The MCSB oversees the MCPS, is a municipality, and is a person under 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  Consequently, it is subject to the

16

mandates of the Fourteenth Amendment.

102.    Defendants Welch, Byrd, McCuiston, and Crowder were public employees of the MCPS and, in the course and scope of their employment, acted under the color of State law in their respective official and individual capacities.

103.    Defendant Edwards was an employee of the Mathews County Sheriff's Office and, in the course and scope of her employment, was acting under the color of State law and in her individual capacity.

104.    Defendant Welch, Byrd, McCuiston, Crowder, and Edwards are persons, pursuant to 42 U.S.C. § 1983, and subject to the mandates of the Fourteenth Amendment.

105.    Plaintiffs are citizens of the United States.

Deprivation of a Property Interest

106.    Plaintiffs have a protected property interest in H.C.'s education.

107.    Defendants cannot deprive them of this interest without due process of law.

108.    At law, Plaintiffs are entitled to complete, meaningful, and effective notice and opportunity to be heard prior to any deprivation of the above protected property interest.

109.    Plaintiffs are also entitled to an impartial decision-maker.

110.    Notwithstanding, Defendants deprived Plaintiffs of their protected property interest in violation of the Due Process Clause of the Fourteenth Amendment.  They did so under the guise of the MCPS's disciplinary threat assessment process without affording even basic due process.

111.    Defendants removed H.C. from the MCPS and ordered him into homebound instruction indefinitely and for no less than 2 months.  In conjunction with demonizing H.C. as an "imminent threat," a criminal, a racist, and a sexual deviant, Defendants ordered him to a materially inadequate and inferior education as alleged, *supra*.

112.    In so removing H.C., Defendants provided Plaintiffs no complete, impartial, meaningful, and effective notice and opportunity to be heard.

113.    In so removing H.C., Defendants provided Plaintiffs no hearing and appeal. Plaintiffs had no opportunity to exchange information, present their side of the story, offer input, and provide contextual and exculpatory evidence.

114.    Rather, biased against Plaintiffs, Defendants pursued a covert, deficient, and one-sided sham of a threat assessment process, arrived at conclusions demonizing and stigmatizing H.C., and demanded Plaintiffs accept them without challenge, dissent, or recourse.

115.    Defendants deprived Plaintiffs of their protected property interest deliberately, intentionally, and/or in reckless disregard of Plaintiffs due process rights.

116.    The Defendant MCSB did so directly through official Policy EBB, which is constitutionally-deficient and enabled and fueled Defendants' personal pursuit against Plaintiffs.

Deprivation of Liberty Interests

117.    Plaintiffs also have protected liberty interests in their good names, reputations, honor, and integrity and in the freedom to engage in educational and employment opportunities.

118.    Defendants cannot deprive them of these interests without due process of law.

119.    At law, Plaintiffs are entitled to complete, meaningful, and effective notice and opportunity to be heard prior to such a deprivation.

120.    Plaintiffs are also entitled to a name-clearing hearing and appeal.

121.    Plaintiffs are also entitled to an impartial decision-maker.

122.    Notwithstanding, Defendants deprived Plaintiffs of their protected liberty interests in violation of the Due Process Clause to the Fourteenth Amendment.  They did so under the guise of the MCPS's disciplinary threat assessment process and without affording Plaintiffs even the

most basic due process.

123.    Defendants deprived Plaintiffs of a protected property interest and, in conjunction therewith, demonized Plaintiffs and H.C. They imposed ruinous stigmas upon Plaintiffs' good names, reputations, honor, and integrity.   As the allegations above demonstrate, Defendants concluded that H.C. (and, thus, Mr. and Mrs. C.) was an "imminent threat" and, in so many words, a criminal, racist, and sexual deviant in need of psychological intervention and quarantine.

124.    These conclusions are false.

125.    In imposing the false conclusions above, Defendants provided Plaintiffs no complete, meaningful, and effective notice and opportunity to be heard, name-clearing hearing, appeal, or non-biased decision-maker.

126.    Instead, Defendants pursued a covert, faulty, flimsy, inadequate, and one-sided threat assessment process and, at its end, demanded Plaintiffs accept their conclusions without challenge, dissent, or recourse.  When Plaintiffs attempted to be heard, Defendants responded by instituting baseless and malicious juvenile, social services, and criminal proceedings.

127.    Defendants have abused their authority.

128.    Defendants, acting in their respective capacities above, deliberately, intentionally, and/or recklessly deprived Plaintiffs of their protected liberty interests.

129.    Defendant MCSB did so through its official Policy EBB, which provides no procedure for notice and opportunity to be heard, challenge, dissent, or recourse.

130.    Defendants Welch, Byrd, McCuiston, Edwards, and Crowder personally authorized, caused, condoned, contributed to, participated in, ratified, or were otherwise aware of Defendant Welch's subsequent placement of the threat assessment team's demonizing and stigmatizing conclusions into H.C.'s student record.

131.     In this context, admissions officials at schools and post-secondary institutions to which H.C. will enroll in the future, including but not limited to the United States Naval Academy, will have access to, learn of, or otherwise view the conclusions in H.C.'s student record. Consequently, H.C.'s educational (and employment) opportunities are and will be foreclosed.  Any school or post-secondary institution to which H.C. applies will deem him a criminal, racist, sexual deviant in need of psychological intervention and quarantine and, thus, refuse him educational opportunities and, thus, employment.  In fact, should H.C. apply for a job or the military, he will likely be asked and have to disclose whether he had ever been charged with a felony, causing further rejection.

132.     Defendant Crowder also publicly disclosed conclusions of the threat assessment team, to which she never should have been privy.  Such disclosures in the small Mathews County have significantly damaged Plaintiffs in their education, reputation, employment, and professions.

Substantive Due Process Violation

133.     The Fourteenth Amendment also prohibits the arbitrary, capricious, and conscience-shocking deprivation of property and liberty interests.

134.     As alleged above, Plaintiffs possessed protected property and liberty interests, and Defendants deprived them of those interests.

135.     Defendants' acts and omissions in so doing were arbitrary, capricious, shocking, and unfair.

136.     Defendants' acts and omissions were in bad faith, with impermissible objectives, and with a predetermined outcome.

137.     Defendants substantially departed from any accepted constitutional and disciplinary norm and, biased, failed to reach reasoned and warranted judgments.

138.     As alleged above, Defendants did so without providing Plaintiffs even the most basic due process and caused a permanent stain on H.C. and his reputation and future.

139.     Complementing the shocking character and nature of Defendants' acts and omissions, Defendants pursued baseless juvenile, social services, and felony criminal proceedings against Plaintiffs, including when they merely requested to be heard.

140.     The shocking character and nature of the Defendants' acts and omissions were most aptly highlighted by Defendant Crowder in November 2019, when she bragged to a witness, "we fixed things pretty good for [H.C.] so he can never return to Mathews County Public School again."

141.     As a direct and proximate result of Defendants' "Deprivation of Property Interest," "Deprivation of Liberty Interests," and "Substantive Due Process Violation" in ¶¶ 98-140, Plaintiffs have suffered tremendously and have sustained significant emotional, financial, personal, and reputational harm.  This harm includes anxiety, bouts of depression, despair, distress, disruption, embarrassment, exclusion, fear, harassment, humiliation, isolation, ostracism, pain and suffering, shame, and stigma.  Additionally, Plaintiffs have also lost past, present, and future income, current and future earning capacities, employment and professional opportunities, and the freedom to pursue educational and occupational paths, which have now been foreclosed.

142.     Plaintiffs, therefore, request this Court grant them the relief requested, *infra*, in the paragraph captioned "Prayer for Relief" at the end of this Complaint.

### COUNT II
### Conspiracy to Interfere with Civil Rights, 42 U.S.C. §§ 1983 and 1985
### (All Plaintiffs v. All Individual Defendants)

143.     Plaintiffs incorporate and re-assert fully herein the allegations of paragraphs 1 through 142, *supra*.

144.     Defendants engaged in a conspiracy to interfere with or violate Plaintiffs' civil

rights, pursuant to 42 U.S.C. §§ 1983 and 1985.

145. Specifically, Defendants combined and came to an agreement and meeting of the minds to remove H.C. from the MCPS and, ultimately, destroy his education and future. In the course of their threat assessment process, Defendants engaged in the specific overt acts, conduct, communications, meetings, statements, and transactions as alleged above.

146. An objective of Defendants' conspiracy was to deprive Plaintiffs of their protected property and liberty interests in violation of the Due Process Clause to the Fourteenth Amendment.

147. Defendants' biased and specific overt acts, conduct, communications, meetings, statements, and transactions above included a covert, manufactured, and sham threat assessment process, removal and ostracization of H.C., refusal to afford even the most basic due process, the meritless institution of juvenile, social services, and criminal proceedings, the placement of demonizing and stigmatizing conclusions in H.C.'s student record, and a disclosure of such conclusions to a member of the public.

148. Defendant Crowder's public boast to a witness that "we fixed things pretty good for [H.C.] so he can never return to Mathews County Public School again." is a testament to Defendants' unlawful objectives and conspiracy.

149. As a direct and proximate result of Defendants' conspiracy, Plaintiffs have suffered tremendously and sustained significant emotional, financial, personal, and reputational harm. This harm includes but is not limited to anxiety, bouts of depression, despair, distress, disruption, embarrassment, exclusion, fear, harassment, humiliation, isolation, ostracism, pain and suffering, shame, and stigma. Additionally, Plaintiffs have lost past, present, and future income, present and current earning capacities, personal and professional opportunities, and the freedom to pursue educational and occupational paths, which Defendants have now foreclosed.

150.     Plaintiffs, therefore, request this Court grant them the relief requested, *infra*, in the paragraph captioned "Prayer for Relief" at the end of this Complaint.

### COUNT III
### Defamation, Virginia Law
### (Plaintiff H.C. v. All Defendants Except Defendants MCSB)

151.     Plaintiffs incorporate and re-assert fully herein the allegations of paragraphs 1 through 150, *supra*.

152.     In the course of the threat assessment process, Defendants published the following but non-exhaustive list of conclusions and statements concerning H.C.:

(a)     H.C. was "frequently put out of school for behaviors including racial comments, lining up black children to berate them, called a student [the 'n' word]";

(b)     "[H.C.] shoved a black child against the locker or wall giving that student a concussion";

(c)     H.C. was subjected to "disciplinary action" at Ware Academy for a "racially-motivated incident";

(d)     H.C. was involved in an "Spring 2019 alleged incident at Ware Academy involving sexual misconduct";

(e)     "[H.C.] must attend intensive-counseling by a licensed professional counselor to address threats to others, sexual aggression and racially based hate crimes";

(f)     H.C.'s "pattern of behaviors are [sic] extremely concerning"; and

(g)     H.C. is an "imminent threat."

153.     In boasting of Defendants' design to a member of the public, Defendant Crowder also re-published one or more of these conclusions.

154.     The above conclusions and statements are false.

155.    These conclusions and statements, individually and collectively, convey the message, implication, and innuendo that H.C. is a criminal, racist, and sexual deviant in need of psychological intervention.  In conjunction with mandatory homebound instruction, they convey a need for quarantine.  They convey an unfitness for social interaction and participation.

156.    These conclusions and statements, individually and/or collectively, sting H.C., injure his reputation in the common estimation of mankind, throw contumely, shame, or disgrace upon him, hold him up to scorn, ridicule, or contempt, and were calculated to render him infamous, odious, or ridiculous.

157.    Defendants published these conclusions and statements in the course of their covert and sham threat assessment process and, upon information and belief, republished them between August 27, 2019 and November 25, 2019, to others who had no legitimate interest or duty in them.

158.    Defendants published the above information and statements intentionally to injure Plaintiffs and knowing they were false or so recklessly as to amount to a willful disregard for the truth, that is, with a high degree of awareness that their conclusions were probably false.

159.    Defendants published the above conclusions and statements out of bias, personal spite, ill-will, in bad faith, and with the desire to harm H.C., independent of the occasion on which the communication was made.

160.    As a direct and proximate result of this defamation, Plaintiffs have suffered tremendously and sustained significant emotional, financial, personal, and reputational harm.  This harm includes but is not limited to anxiety, bouts of depression, despair, distress, disruption, embarrassment, exclusion, fear, harassment, humiliation, isolation, ostracism, pain and suffering, shame, and stigma.  Additionally, Plaintiffs have lost past, present, and future income, present and future earning capacities, present and future personal and professional opportunities, and the

freedom to pursue educational and occupational paths, which Defendants have now foreclosed.

161.    Plaintiffs, therefore, request this Court grant them the relief requested, *infra*, in the paragraph captioned "Prayer for Relief" at the end of this Complaint.

**COUNT IV**
**Malicious Prosecution, Virginia Common Law**
**(Plaintiff H.C. vs. Defendant Edwards)**

162.    Plaintiffs incorporate and re-assert fully herein the allegations of paragraphs 1 through 161, *supra*.

163.    On November 13, 2019, Defendant Edwards maliciously and without probable cause instituted a felony criminal prosecution against H.C.

164.    Defendant Edwards filed two criminal petitions, alleging H.C. in 2016 had attempted felonious assault against C.B., in violation of Virginia Code § 18.2-67.1(A, 1).

165.    Defendant Edwards lacked basis in fact and probable cause to charge H.C. with such offenses.  This charge also related to the purported 2016 incidents, which, as Defendants knew, Kellar had resolved and closed.  Defendant Edwards disagreed with and disregarded Kellar's purportedly derelict handling and the contextual and exculpatory information demonstrating H.C.'s innocence.

166.    Defendant Edwards instituted these criminal prosecutions maliciously.

167.    Defendant Edwards's controlling motive was not the pursuit of justice or to punish the guilty.  Rather, she was motivated by anger, reprisal, to silence the Plaintiffs, to keep H.C. out of the MCPS, and, upon information and belief, to obtain a plea deal from H.C. to protect herself and Defendants from civil liability.

168.    Rightfully, the Court dismissed the prosecutions with prejudice on the merits, terminating the criminal prosecutions in a manner not unfavorable to H.C.

169.     As a direct and proximate result of this malicious prosecution, H.C. has suffered significant emotional, financial, personal, and reputational harm.  This harm includes but is not limited to anxiety, bouts of depression, despair, distress, disruption, embarrassment, exclusion, fear, harassment, humiliation, isolation, ostracism, pain and suffering, shame, and stigma.  H.C. has also sustained significant financial harms as a result of having to hire suitable counsel.

170.     Plaintiffs, therefore, request this Court grant them the relief requested, *infra*, in the paragraph captioned "Prayer for Relief" at the end of this Complaint.

**COUNT V**
**Abuse of Process, Virginia Law**
**(Plaintiff H.C. v. Defendant Edwards)**

171.     Plaintiffs incorporate and re-assert fully herein the allegations of paragraphs 1 through 170, *supra*.

172.     In maliciously instituting criminal prosecutions, Defendant Edwards had an ulterior purpose.  She was angry, sought reprisal, aimed to silence Plaintiffs, and wanted to keep H.C. out of the MCPS.  Upon information and belief, she also had the purpose to obtain a plea deal from H.C. to protect herself and Defendants from civil liability.

173.      In this manner, she used the criminal process and coercion and power of the judiciary oppressively and for purposes for which they were not intended.

174.     Defendant Edwards also requested H.C. submit a DNA swab – yet, no basis supported this irrelevant request other than to harass.  Rightfully, the Court denied it.

175.     As a direct and proximate result of this abuse of process, H.C. has sustained significant emotional, financial, personal, and reputational harm.  This harm includes anxiety, bouts of depression, despair, distress, disruption, embarrassment, exclusion, fer, harassment, humiliation, isolation, ostracism, pain and suffering, shame, and stigma.  H.C. has also suffered

financial losses, including the costs of having to hire an attorney to defend him in the prosecutions.

176.     H.C., therefore, requests this Court grant him the relief requested, *infra*, in the paragraph captioned "Prayer for Relief" at the end of this Complaint.

## COUNT VI
### Intentional Infliction of Emotional Distress
### (All Plaintiffs v. All Individual Defendants)

177.     Plaintiffs incorporate and re-assert fully herein the allegations of paragraphs 1 through 176, *supra*.

178.     Defendants' conduct alleged herein was intentional or reckless, such that they knew or should have known it would cause Plaintiffs severe emotional distress.

179.     Defendants' conduct above was performed for the purposes of removing H.C. from the MCPS, and causing him humiliation, ridicule, and severe distress.  Defendants, who resorted to a covert, manufactured, and sham threat assessment process, wanted to harass and harm Plaintiffs.

180.     Further, Defendants' institution of meritless juvenile, social services, and criminal proceedings, placement of demonizing and stigmatizing conclusions in H.C.'s student record, denial of even the most basic due process rights, and public disclosure of conclusions were intended to cause severe emotional distress to Plaintiffs in their small community.  Defendants' use of the criminal process caused Plaintiffs to fear the consequences of H.C. having a felony record and now the fear of having to disclose a felony charge in any application in the future.

181.     Defendants' acts and omissions with respect to a child and his parents were so outrageous and extreme, prolonged, and vindictive in character and nature that they went beyond all possible bounds of decency and may be regarded as atrocious and utterly intolerable in a civilized community.

27

182.   In fact, Defendants' acts and omissions were an abuse of their authority.

183.   And the Crowders personally intended to inflict punishment on Plaintiffs.

184.   Defendants' conduct directly and proximately caused Plaintiffs emotional distress.

185.   Plaintiffs' resulting distress was so severe that no reasonable person could be expected to endure it.  Plaintiffs' distress includes significant emotional, financial, personal, and reputational harm.  This harm includes anxiety, bouts of depression, despair, distress, disruption, embarrassment, exclusion, fear, harassment, humiliation, isolation, mood swings, ostracism, pain and suffering, shame, and stigma.  Additionally, Plaintiffs have lost past, present, and future income, present and future earning capacities, opportunities, standing, and the freedom to pursue educational and occupational paths, which Defendants have now foreclosed.

186.   Plaintiffs, therefore, request this Court grant them the relief requested, *infra*, in the paragraph captioned "Prayer for Relief" at the end of this Complaint.

## Count VII
## Gross Negligence, Virginia Law
### (All Plaintiffs vs. All Individual Defendants)

187.   Plaintiffs incorporate and re-assert fully herein the allegations of paragraphs 1 through 186, *supra*.

188.   Defendants owed a duty to exercise reasonable care toward Plaintiffs and their well-being in the course and scope of their threat assessment process.

189.   Notwithstanding, Defendants breached that duty.

190.   Defendants breached their duty by deliberately, recklessly, wantonly, and wrongfully pursuing a faulty and inadequate threat assessment process, disregarding and failing to investigate contextual and exculpatory information, which they knew or should have known existed, and excluding Plaintiffs from the process before finalizing the same.  Defendants had four

months to investigate the matter, demonstrating no immediacy existed to warrant Plaintiffs' exclusion from the process or even to label H.C. an "imminent threat" to anyone.

191.    In doing so, Defendants acts and omissions demonstrated an absence of slight diligence and the want of even scant care toward Plaintiffs, and their acts and omissions shock the conscience of a fair-minded person.

192.    In doing so, Defendants acted under a heedless and palpable violation of legal duty respecting the Plaintiffs rights, including under the Fourteenth Amendment.

193.    As a direct and proximate cause of Defendants' gross negligence, Plaintiffs have suffered significant emotional, financial, personal, and reputational harm.  This harm includes anxiety, bouts of depression, despair, distress, disruption, embarrassment, exclusion, fear, harassment, humiliation, isolation, ostracism, pain and suffering, shame, and stigma.  Also, Plaintiffs lost past, present, and future income, earning capacity, opportunities, standing, and the freedom to pursue educational and occupational paths, which Defendants have foreclosed.

194.    Plaintiffs, therefore, request this Court grant them the relief requested, *infra*, in the paragraph captioned "Prayer for Relief" at the end of this Complaint.

## Prayer for Relief

Wherefore, Plaintiffs request the following relief against Defendants, jointly and severally:

(a)    Compensatory damages;

(b)    Punitive damages, to the maximum amount possible under law in light of the egregious, wanton, reckless, and conscious disregard for Plaintiffs' rights and well-being, requiring punishment and deterrence;

(c)    Injunctive relief, including the enjoining of the threat assessment process, reinstatement, expungement of student records, and an apology;

(d)     Declaratory relief, including that Defendants' violated Plaintiffs' rights herein;

(e)     Attorney's fees and costs associated with this action;

(f)     Any such other and further relief as the Court may deem just and proper.

## JURY DEMAND AND AMENDMENT

Plaintiffs hereby demand a trial by jury on all issues so triable and reserve the right to amend the facts and claims as future discovery permits.

**Respectfully Submitted,**
**H.C., C.C., and M.C.**

_____/s/_____
Nicholas Simopoulos, Esquire
VSB No. 68664
Simopoulos Law, PLLC
11 South 12th Street
Richmond, Virginia 23219
(804) 220-5755
nicholas@simopouloslaw.com

*Counsel for Plaintiffs*